NOTICE
Decision filed 04/21/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 160277-U

NO. 5-16-0277

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the |
| ) | Circuit Court of |
|     Plaintiff-Appellee, ) | Jackson County. |
| ) | |
| v. ) | No. 14-CF-522 |
| ) | |
| MELVIN L. SANFORD, ) | Honorable |
| ) | William G. Schwartz, |
|     Defendant-Appellant. ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's conviction for home invasion with a firearm is affirmed where the trial court did not err in denying his motion to suppress; where the defendant is not entitled to have his conviction vacated and his charge dismissed based on 725 ILCS 5/103-5 (West 2014); where the State proved the defendant guilty of home invasion with a firearm beyond a reasonable doubt; and where he was not denied effective assistance of counsel. Pursuant to Illinois Supreme Court Rule 472(e) (eff. May 17, 2019), we remand this case to the trial court for the defendant to file a motion regarding clerk-imposed fines should he choose to do so.

¶ 2    This is a direct appeal from the circuit court of Jackson County. The defendant, Melvin L. Sanford, was convicted of home invasion with a firearm. On June 20, 2016, he was sentenced to an enhanced sentence of 25 years' imprisonment followed by 3 years of

1

mandatory supervised release (MSR). The defendant raises five points on appeal: (1) that the trial court erred in denying his motion to suppress, (2) that his conviction should be vacated and his charge dismissed pursuant to section 103-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-5 (West 2014)), (3) that the State failed to prove the charge against him beyond a reasonable doubt, (4) that he was denied effective assistance of counsel, and (5) that the circuit clerk improperly imposed a number of fines against him. For the reasons that follow, we affirm the defendant's conviction but remand pursuant to Illinois Supreme Court Rule 472(e) (eff. May 17, 2019) to allow the defendant an opportunity to challenge the clerk-imposed fines.

¶ 3                                    I. BACKGROUND

¶ 4      On December 12, 2014, the defendant was charged by information with one count of home invasion (720 ILCS 5/19-6(a)(3) (West 2014)).[1] It was alleged that the defendant along with Terrance A. Vinson, who was the defendant's brother, and Elijah J. Mosley, "without authority entered the dwelling place of Larry and BethAnn Clites[2] *** and remained therein when they had reason to know that one or more persons were present therein and while armed with a firearm used force or threatened imminent use of force on persons within the dwelling place." The information further alleged that the State would be seeking a mandatory 15-year sentencing enhancement based on the fact that the offense

---

[1]The defendant was also charged and convicted of one count of armed robbery. However, that conviction was subsequently vacated by the trial court in accordance with the one-act, one-crime doctrine. Facts relating to the armed robbery charge will only be discussed to the extent necessary to provide relevant background and address the defendant's arguments.

[2]Because Larry and BethAnn or Beth Clites share a last name, we will refer to them individually by their first names for ease of reference.

2

was committed while the men were armed with firearms (*id*. § 19-6(c)). Mosley's case was severed before trial; the defendant and Vinson were tried together.

¶ 5    Each accused was appointed his own attorney, with John McDermott being appointed to represent the defendant on December 16, 2014. During the December 22, 2014, preliminary hearing, the defendant requested a jury trial, and the case was set for trial on March 23, 2015. The trial date was subsequently continued and reset for May 18, 2015. On February 2, 2015, McDermott moved to withdraw as the defendant's counsel due to a conflict of interest. The trial court granted the motion and appointed Christian Baril to the defendant's case. Baril similarly withdrew due to a conflict, and Kelly Zuber was appointed to represent the defendant. After Zuber also withdrew due to a conflict, the court appointed a new attorney to the defendant's case. However, the fourth attorney's appointment was vacated, and the court appointed the defendant's trial counsel, Thomas Mansfield, on April 7, 2015.

¶ 6    On May 11, 2015, the defendant filed a motion to suppress evidence recovered from his vehicle. Due to the filing of the motion to suppress, the May 18 trial date was continued.

¶ 7    At a pretrial hearing on May 28, 2015, the trial court took up the matter of the defendant's motion to suppress. The defense called Officer Timothy Lomax of the Carbondale Police Department, who was involved in the stop of the defendant's vehicle in the early morning hours of December 11, 2014. The video recording from Lomax's patrol vehicle depicting the stop and search was played for the court.

¶ 8    On cross-examination, Lomax testified as to the following. On the night in question, Lomax learned via dispatch that a home invasion with a firearm had occurred. He then

3

heard Officer Blake Harsy's radio transmissions that a cell phone stolen during the home invasion had global positioning system (GPS) tracking. According to the GPS tracking, the phone was traveling toward the intersection of Country Club Road and Old Route 13. Lomax drove his patrol vehicle to that location, stationed himself in a parking lot near that intersection, and observed a "brown '88 Cadillac" traveling northbound on Country Club Road approaching Old Route 13. Lomax testified that he did not see any other vehicles traveling northbound on Country Club Road approaching the intersection at that time.

¶ 9 After his initial observation of the Cadillac, Lomax received a radio transmission that the stolen cell phone was heading west on Old Route 13. Simultaneously, he saw the Cadillac heading in that same direction. Lomax did not see any other vehicles traveling west on Old Route 13 at that time, so he decided to follow the Cadillac. The next radio transmission indicated that the stolen phone was heading west on Old Route 13 and passing Gibbs Lane. At that time, Lomax and the Cadillac were traveling westbound on Old Route 13 and were approximately 500 feet west of Gibbs Lane; they had just passed it. Again, there were no other vehicles traveling westbound in the area of Gibbs Lane at the time. Lomax testified that based upon all the communications that he received about the GPS tracking of the stolen cell phone's locations, along with his observations of the Cadillac's movements, he believed the stolen cell phone was located in that vehicle. For that reason, he initiated a "felony stop" or "high-risk stop" of the Cadillac, which was determined to be the defendant's vehicle.

¶ 10 The defendant and his occupants were ordered out of the vehicle and detained. Lomax and other officers assisting with the stop then cleared the car, searching for anyone

4

hiding therein. Immediately after the trunk was opened and cleared, one of the officers stood near the rear passenger side door and shone a flashlight into the car looking for "any evidence in plain view, the phones, guns, weapons or drugs." The officers discovered two cell phones in the map pocket behind the driver's seat as soon as they looked inside the vehicle. Nevertheless, they did not immediately enter the car to seize them because although they "appeared to be" the stolen cell phones, the officers wanted to be sure. Therefore, the officers obtained a physical description of the stolen phones and the numbers to which they belonged. Lomax observed that the phones matched the descriptions provided. Officer Jeff Withrow then dialed each of the victims' cell phone numbers. After he dialed one of the numbers, one of the cell phones in the map pocket lit up, and Withrow reached into the car to check that the phone was showing the number from which he was calling. At that point, Lomax believed they had found the cell phones stolen from the Clites' trailer. The police then searched the rest of the defendant's vehicle and seized evidence found therein.

¶ 11    The trial court denied the motion to suppress, finding:

> "The argument of the defendant is that there were no exigent circumstances in this case. I disagree. First of all, we're holding defendants who are alleged to have committed a crime. They were investigating that crime at the stop of the vehicle. The crime had just occurred, and as I've just previously stated, there was a tracking device that happened to be in the vehicle, based upon the stolen phones that were taken at the scene. It is incumbent both by common sense, rationality, and by proper police procedure and not unconstitutional to see if those phones and the tracking that was conducted was in fact coming from that particular vehicle. How did they do it? They visually observed an item that resembled an item which came from the crime, namely the cell phone or cell phones.
>
> * * *
>
> The point is that the police were—I hate to use the term 'in hot pursuit,' but I know that it's in some procedures, and not in the sense that they watched somebody

5

come out of a bank and they were chasing them, but rather a crime had just occurred and they had determined that there was a manner of tracking that vehicle. They used that method of tracking the vehicle to locate the vehicle. They located the tracking device from observation from outside of the car and then they made sure that it was the correct tracking device by having those phones called and using the phone numbers of the owners of the phones, and the phones rang inside of the car."

¶ 12    On August 24, 2015, the defendant and Vinson's three-day jury trial commenced. We have previously recited the evidence adduced at trial in an order issued pursuant to Illinois Supreme Court Rule 23 (eff. Apr. 1, 2018) in Vinson's appeal. *People v. Vinson*, 2019 IL App (5th) 160124-U, ¶¶ 7-31. However, because the defendant claims that he was not proved guilty beyond a reasonable doubt, we will set forth additional evidence, which we find relevant to the defendant's involvement in the home invasion.

¶ 13    Detective Aaron Baril testified that he interviewed the defendant, who changed his story several times. The defendant initially told Baril that he went to pick Vinson up from their mother's house but fell asleep while he was waiting, and Mosley got into the backseat of the vehicle uninvited. The defendant claimed that the men were driving to Murphysboro when they were stopped by the police. However, the defendant subsequently admitted that they stopped at their friend Mariah Herron's house. The defendant insisted that he did not know that Mosley was going to be there. Nevertheless, he also admitted that once the three men were together, no one else got in the car, and they were together until they were stopped by the police. Vinson and the defendant voluntarily consented to a search of their cell phones.

¶ 14    Detective Brandon Weisenberger also interviewed the defendant, who admitted to Weisenberger that from the time he picked up Vinson and Mosley until they were stopped,

6

no one was in the car with them, and it was just those three in the vehicle all night. When Weisenberger asked the defendant how the stolen phones could have been in his car, the defendant's explanation was that it was attributed to "[s]ome paranormal activity shit."

¶ 15 The defendant was also interviewed by Sergeant Anthony Williams. The defendant initially told Williams that he drove to pick up Vinson at their mother's house on North Marion Street in Carbondale, sent Vinson a text saying that he was there, and fell asleep in the car while waiting for Vinson. The defendant said Vinson got in the car, and he drove on a direct route to Pleasant Hill Road, where police stopped them. He said they did not make any stops, and because he was asleep when Vinson got into his car, he did not know Mosley was in the vehicle until the police stopped them.

¶ 16 The defendant later changed his story, telling Williams that after he picked up Vinson and Mosley, they drove around the Southern Illinois University campus and near the trailer parks on South Illinois Avenue before police stopped them. The defendant said this only after Williams asked if there was a chance that his vehicle would appear on video surveillance of a store on Route 51 near the Clites' trailer park. In this and subsequent versions of his story, the defendant admitted that he knew Mosley was in the vehicle.

¶ 17 After being confronted with new information, the defendant admitted that the men visited the trailer of a woman named Mariah. From the defendant's description, Williams identified the trailer as the one at 76 Gold Drive and the woman as Herron. The defendant subsequently said that in addition to the route previously mentioned, they stopped at the Malibu apartment complex, which was near the Clites' trailer park. The defendant said he believed this was the home of Mosley or his mother. The defendant also admitted to

Williams that from the time he picked up Vinson and Mosley until the time they were stopped, no one else was in his vehicle.

¶ 18 After the State rested its case, the defense filed a motion for directed verdict, which was denied. The defendant did not testify or present any evidence in his defense.

¶ 19 After closing arguments, the trial court instructed the jury, *inter alia*, that: "Neither opening statements nor closing arguments are evidence"; "Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them"; and "When a witness says that he or she was involved in a commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in the light of the other evidence in the case." Also included in the jury instructions was Illinois pattern instruction 11.54, which reads as follows:

> "To sustain the charge of home invasion, the State must prove the following propositions:
>
> *First Proposition:* That the defendant was not a police officer acting in the line of duty; and
>
> *Second Proposition:* That the defendant knowingly and without authority entered the dwelling place of another; and
>
> *Third Proposition:* That the defendant entered the dwelling place and remained in the dwelling place until he knew or had reason to know that one or more persons was present; and
>
> *Fourth Proposition:* That the defendant, or one for whose conduct he is legally responsible, was armed with a dangerous weapon; and
>
> *Fifth Proposition:* That while armed with a dangerous weapon the defendant threatened the imminent use of force on persons within the dwelling place.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." Illinois Pattern Jury Instructions, Criminal, No. 11.54 (4th ed. 2000).

The jurors were additionally instructed that:

"The State has alleged that the defendants, or one for whose conduct they were legally responsible, were armed with firearms.

\* \* \*

To sustain the allegation in connection with the offense of armed robbery and home invasion, the State must prove the following propositions: That during the commission of the offense of \*\*\* home invasion, the defendants, or one for whose conduct they were legally responsible, was armed with a firearm.

If you find from your consideration of all the evidence that the above proposition has been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was proven."

¶ 20　The jury found the defendant and Vinson guilty of home invasion and further found that each individual, or one for whose conduct he was legally responsible, was armed with a firearm during the commission of the charged offense.

¶ 21　On September 14, 2015, the defendant and Vinson filed a joint *pro se* motion for a new trial alleging, *inter alia*, ineffective assistance of counsel. On September 18, 2015, Mansfield moved to withdraw based on the defendant's *pro se* motion. The trial court allowed Mansfield to withdraw and appointed Jennifer Cavaness to serve as the defendant's posttrial counsel on September 22, 2015. On January 4, 2016, Cavaness filed

a motion for leave to withdraw as the defendant's attorney. The court granted the motion to withdraw and appointed Nick Brown to represent the defendant.

¶ 22 On June 8, 2016, the defendant filed a motion for new trial[3] alleging, in part, trial counsel's ineffectiveness in failing to file a motion to suppress based on the police search of cell phone data on the two stolen cell phones and in failing to object or file a motion *in limine* regarding Weisenberger's historical cell site analysis (HCSA) testimony. The defendant also alleged that Mosley's testimony should not have been believed and that the evidence at trial was not sufficient to support a guilty verdict.

¶ 23 On June 20, 2016, a hearing was held on the matters of posttrial motions and sentencing. Brown argued that the defendant's trial counsel was ineffective for not arguing that officers needed a warrant to inspect digital data on the phones found in the map pocket of the car and argued that after a phone rang, the police should have gotten a search warrant. The State responded by noting that the defendant had no standing to contest a search of the victims' phones. The trial court denied the motion for new trial and proceeded to sentencing. The defendant was sentenced to 10 years' imprisonment as to home invasion and 15 years' imprisonment pursuant to the firearm sentencing enhancement, to be followed by 3 years of MSR. The court subsequently found the defendant was entitled to 588 days of credit for time spent in presentence custody. The court did not address or impose any fines or fees against the defendant in its oral pronouncement of the sentence or

---

[3]Prior to moving to withdraw as the defendant's counsel, Mansfield filed a posttrial motion on the defendant's behalf. However, Mansfield's motion was subsequently abandoned after Brown was appointed and filed his own motion for new trial. The motion for new trial filed by Brown on behalf of the defendant was the only one argued by the parties and the one ultimately ruled on by the trial court.

10

in the written sentencing order entered on June 21, 2016. Thereafter, the circuit clerk included several entries in the electronic accounts receivable balance sheet pertaining to the defendant's case. The entries indicated that the defendant was obligated to pay mandatory fines that were not specified in the court's judgment.

¶ 24 The defendant filed his notice of appeal on June 27, 2016.

¶ 25                                II. ANALYSIS

¶ 26 On appeal, the defendant makes five contentions. First, he argues that the trial court erred in denying his motion to suppress. Second, he asserts that his conviction should be vacated and the charge against him dismissed pursuant to section 103-5 of the Code (725 ILCS 5/103-5 (West 2014)). Third, he contends that the State failed to prove the charge against him beyond a reasonable doubt. Fourth, he maintains that he was denied effective assistance of counsel. Fifth, he argues that the circuit clerk improperly imposed a number of fines against him.

¶ 27                             A. Motion to Suppress

¶ 28 The first issue raised by the defendant is whether the trial court erred in denying his motion to suppress. The State initially argues that the defendant has forfeited this argument on appeal because he did not raise it in a posttrial motion. "Ordinarily, to preserve an issue for review a party must raise it at trial and in a written posttrial motion." *People v. Almond*, 2015 IL 113817, ¶ 54. Although the defendant failed to raise this fourth amendment issue in his posttrial motion, he raised it prior to trial in a written motion to suppress. At the suppression hearing, trial counsel argued evidence recovered from the vehicle was the result of a warrantless search in violation of the defendant's fourth amendment rights.

11

"[C]onstitutional issues that were previously raised at trial and could be raised later in a postconviction petition are not subject to forfeiture on direct appeal." (Emphasis omitted.) *Id.* " '[T]he interests in judicial economy favor addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition.' " *Id.* (quoting *People v. Cregan*, 2014 IL 113600, ¶ 18). Accordingly, we will review the merits of the defendant's claim.

¶ 29    In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). We review *de novo* the court's ultimate legal ruling as to whether suppression is warranted. *Id.* A court's findings of fact and credibility determinations are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *Id.* The reason is because the trial court is in a better position to determine and weigh the credibility of the witnesses, observe their demeanor, and resolve conflicts in the testimony. *Id.* A judgment is against the manifest weight of the evidence where the opposite conclusion is apparent or when the findings are unreasonable, arbitrary, or not based on evidence. *People v. Lopez*, 2013 IL App (1st) 111819, ¶ 17.

¶ 30    Both the United States and Illinois Constitutions protect citizens from unreasonable searches and seizures. U.S. Const., amend. IV.; Ill. Const. 1970, art. I, § 6. Our supreme court has interpreted the search and seizure clause of the Illinois Constitution in a manner consistent with the United States Supreme Court's fourth amendment jurisprudence. *People v. Caballes*, 221 Ill. 2d 282, 335 (2006). The primary focus of a fourth amendment inquiry is the reasonableness of government action. *People v. Jones*, 215 Ill. 2d 261, 268-

69 (2005). We note that in this case the defendant does not contest the constitutionality of the initial stop of his vehicle. Instead, the defendant argues that the subsequent search of his vehicle and seizure of evidence discovered therein was unconstitutional.

¶ 31 A warrantless search is *per se* unreasonable unless one of a number of exceptions applies. *Cregan*, 2014 IL 113600, ¶ 25. One such exception is the automobile exception, which allows for the warrantless search of a vehicle when a law enforcement officer has probable cause to believe that the vehicle contains evidence of criminal activity that he could lawfully seize. *People v. Hill*, 2019 IL App (4th) 180041, ¶ 31; *People v. Stroud*, 392 Ill. App. 3d 776, 803 (2009). The exception is based upon the reduced expectation of privacy in a vehicle and the exigency caused by a vehicle's ready mobility. *People v. Slavin*, 2011 IL App (2d) 100764, ¶ 13. Stopping an automobile for a minor traffic violation does not justify a search of a vehicle under this exception; instead, the officer must reasonably believe he is confronting a more serious situation. *People v. Contreras*, 2014 IL App (1st) 131889, ¶ 28. The scope of a warrantless search under the automobile exception extends to every part of the vehicle and any interior compartment that may contain the object of the search. *Id.*; *Stroud*, 392 Ill. App. 3d at 803.

¶ 32 An officer has probable cause to search a vehicle "where the totality of the facts and circumstances known to the officer at the time of the search, in light of the officer's experience, would cause a reasonably prudent person to believe that a crime occurred and that evidence of the crime is contained in the automobile." *Stroud*, 392 Ill. App. 3d at 803. Probable cause is a not a technical concept; rather, it is a fluid construct dependent upon the assessment of probabilities in a particular factual context. *Jones*, 215 Ill. 2d at 274. In

order to determine whether probable cause for a search existed, the reviewing court must examine the events leading up to the search or seizure from the perspective of an objectively reasonable law enforcement officer. *Id.*

¶ 33    Although the defendant's argument on appeal focuses on whether the officers were constitutionally permitted to search his vehicle under *Michigan v. Long*, 463 U.S. 1032 (1983), we may affirm the trial court on any basis supported by the record. *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005). Upon hearing evidence and arguments on the defendant's motion to suppress, the court found that the search was proper in that the officers had information that a crime had just occurred, there was a manner of tracking a piece of evidence of that crime, and the Cadillac's occupants were suspected of committing the crime based on the fact that the officers used the tracking device to locate the vehicle containing the stolen cell phone. The court's findings of fact indicate that it agreed with the State's argument that the officers did not need a warrant to search the defendant's vehicle because they had probable cause to believe that it contained evidence subject to seizure. This conclusion was not against the manifest weight of the evidence.

¶ 34    The evidence adduced during the suppression hearing revealed that prior to stopping the defendant's vehicle, Lomax received information that its occupants were suspected of being involved in a home invasion with a firearm. In light of such information, Lomax and the assisting officers conducted a "felony stop" or "high-risk stop" as they reasonably believed they were confronting a situation more serious than a minor traffic violation. After hearing Harsy's communications about the GPS tracking of the stolen cell phone, and personally following the defendant's vehicle taking a path consistent with the phone's

14

movements, Lomax had more than a bare suspicion that the phones were in the vehicle. Instead, Lomax had probable cause to believe that the vehicle contained items stolen from the Clites' trailer that the officers could lawfully seize. See *People v. Lee*, 2018 IL App (3d) 160100, ¶ 17 ("[p]robable cause is not a high bar" (internal quotation marks omitted)). Accordingly, the warrantless search of the vehicle, including its interior compartments, and the seizure of the incriminating items found therein were proper pursuant to the automobile exception. See *People v. Talach*, 114 Ill. App. 3d 813, 819-20 (1983) (similarly finding officers had probable cause to search a vehicle under the automobile exception, and thus, probable cause to seize the incriminating items found therein).

¶ 35    Notwithstanding the fact that the officers already had probable cause to search the defendant's vehicle and seize evidence found therein, the officers independently confirmed their reasonable belief that the stolen cell phones were in the vehicle by: (1) obtaining a physical description of the stolen phones and the numbers to which they belonged, (2) visually observing that the phones found in plain view in the vehicle matched the descriptions provided, and (3) calling the numbers belonging to the cell phones stolen from the victims. After Withrow dialed one of the numbers, one of the phones in the map pocket lit up, and he reached into the car to check that the phone was showing the number from which he was calling. Withrow subsequently determined that the second phone showed a missed call from his phone number. An officer is not required to know that an item is contraband or evidence of a crime in order to seize it. *Jones*, 215 Ill. 2d at 277. Nevertheless, the officers involved in the search of the defendant's vehicle made certain

15

that the phones they discovered in the map pocket were those stolen from the Clites' trailer prior to seizing them as evidence.

¶ 36    In sum, we find that based on the totality of the foregoing facts and circumstances, and viewed from the standpoint of an objectively reasonable law enforcement officer, Lomax and the other officers had probable cause to believe that the defendant's vehicle contained evidence of criminal activity that they were entitled to seize.  Accordingly, no warrant was necessary to search the vehicle as the search was justified by the automobile exception.  Because the search and seizure did not violate the defendant's rights under the fourth amendment, the trial court did not err in denying the defendant's motion to suppress.

¶ 37    The defendant has also argued on appeal that his posttrial counsel was ineffective for failing to properly preserve the motion to suppress issue for appeal.  However, as we have found that the trial court properly denied the motion, the defendant cannot show he was prejudiced by posttrial counsel's alleged error and his ineffective assistance claim must fail.  See *People v. Holmes*, 397 Ill. App. 3d 737, 744 (2010) (defense counsel will not be found ineffective for failing to file a meritless motion).

¶ 38                               B. Speedy Trial

¶ 39    The defendant next asserts that his conviction should be vacated and his charge dismissed pursuant to section 103-5 of the Code (725 ILCS 5/103-5 (West 2014)).  Because he failed to preserve this claim of error in a posttrial motion, it is considered forfeited unless we deem it to be plain error.  See *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 40    The plain-error doctrine allows a reviewing court to consider an unpreserved error when a clear or obvious error occurred and the evidence at trial was closely balanced, or

the error was so egregious, as to deny a defendant a fair trial. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under either prong of the plain-error analysis, the burden of persuasion remains with defendant. *Id*. However, the first step in plain-error review is to determine whether an error occurred. *People v. Johnson*, 347 Ill. App. 3d 570, 574 (2004).

¶ 41 Section 103-5(a) of the Code provides: "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant." 725 ILCS 5/103-5(a) (West 2014). The statute enforces the constitutional right to a speedy trial guaranteed by the United States and Illinois Constitutions. *People v. Mosley*, 2016 IL App (5th) 130223, ¶ 9 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). Despite the defendant's failure to preserve this issue for appeal, we will review his claim under the plain-error doctrine because a speedy trial is a substantial fundamental right. *Id*.

¶ 42 The 120-day speedy-trial period starts automatically when a defendant remains in custody pending trial. *People v. Mayo*, 198 Ill. 2d 530, 536 (2002). If a defendant is not tried within the statutory speedy-trial period, he must be released and the charges dismissed. 725 ILCS 5/103-5(d) (West 2014). Under the statute, a delay is any action by the parties or the trial court that moves the trial date outside of the speedy-trial term. *People v. Cordell*, 223 Ill. 2d 380, 390 (2006).

¶ 43 In order to prevent the speedy-trial clock from tolling, a defendant must object to any attempt to place the trial date outside the 120-day period. *Id*. "Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 5/103-5(a)

17

(West 2014).  The statute "places the onus on a defendant to take affirmative action when he becomes aware that his trial is being delayed."  *Cordell*, 223 Ill. 2d at 391.  Although there are no "magic words" that constitute a sufficient demand for trial, some affirmative statement requesting a speedy trial is required.  *Id*.  In addition, a defendant is bound by his attorney's actions unless he clearly and convincingly attempts to assert his right to discharge his attorney and proceed to trial immediately.  *Mayo*, 198 Ill. 2d at 537.

¶ 44    The dispositive issue is whether the trial court erred in attributing a delay to the defendant.  Although it is the State's duty to ensure that a defendant is tried within the statutory period (*id*. at 536), defendant bears the burden of affirmatively establishing a violation of his speedy trial rights (*People v. Kliner*, 185 Ill. 2d 81, 114 (1998)).  The court's decision to attribute a delay to defendant is entitled to substantial deference and will not be overturned on appeal absent an abuse of discretion.  *Mayo*, 198 Ill. 2d at 535.  An abuse of discretion occurs when the court's ruling is unreasonable, arbitrary, or fanciful, or when no reasonable person would take such a view.  *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 45    The following facts are relevant to our discussion.  On March 11, 2015, the defendant's attorney, Baril, filed a motion to withdraw and a motion to continue.  Prior to the March 17, 2015, pretrial hearing, codefendants Mosley and Vinson filed motions to continue the case.  At the pretrial hearing, the defendant was present but Baril was not.  The trial court said it was granting Baril's motion to withdraw and appointing Zuber to represent the defendant.  The court granted Mosley's and Vinson's motions to continue and stated that it would set a new trial date.  The delay was attributed to the defendant, Mosley, and Vinson.  The defendant did not object to any of the court's orders.  On March

18

25, 2015, the court entered a written order, which, *inter alia*, granted Vinson's and Mosley's motions to continue, attributed the delay to all three defendants, and set the matter for trial on May 18, 2015.[4] No written objection to the March 25 order was filed by the defendant or his counsel.

¶ 46 Zuber filed a motion to withdraw on March 30, 2015. On April 2, 2015, the trial court received a *pro se* letter from the defendant complaining about Zuber and requesting a new attorney. The court granted Zuber leave to withdraw and appointed a new attorney to represent the defendant. However, the fourth attorney's appointment was subsequently vacated, and the court appointed Mansfield on April 7, 2015.

¶ 47 During the case management conference on April 13, 2015, the defendant and Mansfield were both present, and Mansfield stated that he believed he would be ready for trial as scheduled. On May 8, 2015, the defendant filed a motion to formally object to the March 17, 2015, continuance being attributed to him. The motion stated, *inter alia*, that the defendant asked Zuber to object to the March 17 delay and to demand speedy trial, but Zuber refused to do so; that Mansfield was appointed to represent the defendant on April 7, 2015; and that notice of the May 18 trial date was sent to Mansfield two days before the April 13 pretrial hearing. The defendant also filed a motion to dismiss the charges against him based on an alleged violation of his statutory speedy trial rights (725 ILCS 5/103-5(a)

---

[4]The parties agree that the defendant's speedy-trial term expired on April 13, 2015. Thus, the March 25, 2015, order set the defendant's case for trial outside of the 120 days.

19

(West 2014)).  On May 11, 2015, the defendant filed a motion to suppress.  Due to the filing of the motion to suppress, the May 18 trial date was continued.[5]

¶ 48    At the May 28, 2015, hearing on the defendant's motions, the trial court asked Mansfield to argue the motion objecting to the March 17, 2015, delay being attributed to the defendant.  Mansfield responded that the motion was drafted by the defendant, that he filed it at the defendant's request, and that the defendant wished to address the court on the matter.  The court refused to allow the defendant to argue the motion because he was represented by counsel.  Mansfield then argued his motion to dismiss on speedy trial grounds, asserting that the defendant had not caused any delay and the speedy-trial term had expired.  The State responded in part that the defendant did not object to the May trial setting until after the speedy-trial term had run.  The court denied both of the defendant's speedy trial motions.

¶ 49    Thus, the record reveals that the defendant's trial was delayed for purposes of our analysis when the trial court granted Vinson's and Mosley's motions to continue the March 23 trial date; attributed the delay to the defendant, Vinson, and Mosley; and set the matter for trial on May 18, 2015.  See *Cordell*, 223 Ill. 2d at 390 (any action by the parties or the

---

[5]Delays caused by the defendant's filing of motions, and the time naturally associated with their processing, is chargeable to the defendant for speedy trial purposes.  *People v. Myers*, 352 Ill. App. 3d 684, 688 (2004).

court that sets trial outside the 120-day limit qualifies as a "delay" pursuant to the statute).[6]

Accordingly, the defendant was obligated to promptly object to the foregoing or be deemed to have acquiesced in the delay being attributed to him. See *id*. at 391.

¶ 50    The defendant, however, failed to object or demand a speedy trial until May 8, 2015, *i.e.*, over one month after the relevant orders were entered and after the speedy-trial term had expired. The record reveals that the defendant stood silent during the March 17 pretrial hearing when the trial court orally granted Vinson's and Mosley's motions to continue the March 23 trial date. He did not object or in any way question the court's decision to attribute the delay to himself and his codefendants. Further, the defendant failed to file a written objection, either *pro se* or through his attorney, to the March 25 order granting the continuance, attributing delay to the defendants, or setting the matter for trial on May 18, 2015. The motion to formally object, signed by the defendant, indicates that he knew of the speedy trial issue while Zuber was representing him in March. The defendant has asserted, after the fact, that he wanted Zuber to object to the delay being attributed to the defendant and demand a speedy trial but Zuber refused. However, the defendant failed to object to such actions in his April 2, 2015, letter to the trial court complaining about Zuber.

---

[6]Although the defendant also argues that delays caused by the fact that he had four attorneys withdraw from his case due to conflicts of interest should be charged to the State and counted in his speedy-trial term, he has failed to establish that these periods actually constituted "delays" for purposes of the statute in that they did not set the trial outside of the 120-day limit. See *Cordell*, 223 Ill. 2d at 390. While it is true Baril had also filed motions to withdraw and to continue prior to the March 17 hearing, there is no indication that the trial court actually ruled on them. When there are two reasons for a delay, the fact that one rendered the delay attributable to the defendant will be sufficient to toll the statutory term. See *Myers*, 352 Ill. App. 3d at 688.

See *People v. Lilly*, 2016 IL App (3d) 140286, ¶ 27 (where a defendant fails to promptly repudiate his attorney's actions, he effectively ratifies them).

¶ 51 Moreover, the motion signed by the defendant indicates that he and Mansfield learned of the speedy trial issue prior to the April 13, 2015, pretrial hearing but failed to orally object to the trial date being outside of the 120-day term. Instead, Mansfield affirmatively stated that he was ready to proceed to trial as scheduled on May 18. Again, the defendant was bound by Mansfield's actions because he failed to promptly repudiate them. See *Mayo*, 198 Ill. 2d at 537; *Lilly*, 2016 IL App (3d) 140286, ¶ 27.

¶ 52 We find the defendant in this case did exactly what the supreme court warned against in *Cordell*. The defendant stood silent while the trial court granted his codefendants continuances, set the matter for trial outside of the 120-day term, and attributed the delay to him and his codefendants. At the next court appearance where he was present with counsel, his counsel acquiesced in the matter being set for trial on May 18, outside the speedy-trial term. The defendant's efforts to have his charges dismissed after the speedy-trial term expired is the type of offensive use of the speedy-trial statute that is not permitted.

¶ 53 To find in the defendant's favor on his claim would allow a defendant to sit idly by, wait until the speedy-trial term has expired, and then protest that his right to a speedy trial had been violated. If a defendant is considered to have agreed to a delay, unless he objects to it by making a demand for trial, it is also reasonable to require a defendant to timely object when the trial court charges a period of time against him. A contrary ruling would also contravene the *Cordell* court's admonition that the speedy-trial statute should not be used "to open a new procedural loophole which defense counsel could unconscionably use

to obstruct the ends of justice." (Internal quotation marks omitted.) *Cordell*, 223 Ill. 2d at 390. Stated differently, under the factual scenario present here, the defendant was not using section 103-5(a) "as a shield" to preserve his right to a speedy trial but rather "as a sword after the fact" to seek dismissal of the charges against him on speedy trial grounds after he tacitly agreed that the time period in dispute was attributable to him.

¶ 54    Based on the foregoing, we find that the defendant has failed to carry his burden of proving that the trial court abused its discretion in attributing the March 17 delay to him. Because no violation of his statutory speedy trial rights occurred, the defendant is not entitled to have his conviction vacated and his charge dismissed.

¶ 55    The defendant has also argued on appeal that his trial counsel was ineffective for failing to argue his motion to formally object to the March 17 delay being attributed to him, and that his posttrial counsel was ineffective for failing to raise the issue in a posttrial motion. The defendant alleges that he was prejudiced by trial counsel's failure because it led the court to attribute the delays caused by the fact that he had four attorneys withdraw from his case to him. However, as we have previously found, the defendant has failed to establish that these periods actually constituted "delays" for purposes of the statute in that they did not set trial outside of the 120-day limit. See *Cordell*, 223 Ill. 2d at 390; see also *Myers*, 352 Ill. App. 3d at 688 (when there are two reasons for a delay, the fact that one rendered the delay attributable to the defendant will be sufficient to toll the statutory term). Thus, the defendant's motion was without merit, and trial counsel will not be found ineffective for failing to pursue it. See *Holmes*, 397 Ill. App. 3d at 744 (defense counsel will not be found ineffective for failing to pursue a meritless motion). Similarly, as there

23

was no error, posttrial counsel cannot be found ineffective for failing to raise the issue in a posttrial motion.

¶ 56                                    C. Beyond a Reasonable Doubt

¶ 57    If the State fails to prove a defendant guilty beyond a reasonable doubt, the conviction must be overturned. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). On review, a jury's finding of fact will not be disturbed on appeal if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A reviewing court will not reweigh the evidence or make any credibility determinations regarding witnesses. *People v. Thomas*, 178 Ill. 2d 215, 232 (1997).

¶ 58    Here, the defendant argues that the State failed to prove him guilty of armed robbery and home invasion beyond a reasonable doubt. At the outset, however, we must clarify that although the defendant has challenged the evidence to support both of his convictions on appeal, only his conviction for home invasion with a firearm stands at this point. As previously stated, the defendant's armed robbery conviction was vacated by the trial court in accordance with the one-act, one-crime doctrine. Therefore, we need not determine whether the State proved him guilty of armed robbery beyond a reasonable doubt.

¶ 59    The home invasion statute provides, in pertinent part, that a person, who is not a police officer acting in the line of duty, commits home invasion when, without authority, he knowingly enters the dwelling place of another when he knows or has reason to know that one or more persons is present and, while armed with a firearm, uses force or threatens the imminent use of force upon any person within the dwelling, regardless of whether an

24

injury occurs. 720 ILCS 5/19-6(a)(3) (West 2014). Under the statute, "a defendant enters the dwelling place of another 'without authority' when *** the occupant has not granted consent to enter." *People v. Witherspoon*, 2019 IL 123092, ¶ 25. The defendant does not specifically challenge the evidence supporting any of the elements of home invasion with a firearm. Instead, he argues that the evidence was insufficient to support his conviction because it consisted mostly of his codefendant Mosley's testimony. The defendant maintains that Mosley was the only witness who identified him as one of the intruders, and that Mosley testified pursuant to a favorable plea agreement with the State. The defendant suggests that, based on Mosley's testimony being "largely uncorroborated," and contradictory to the victims' testimony, his testimony could not be trusted.

¶ 60 An accomplice's testimony "has inherent weaknesses as the testimony of a confessed criminal [is] fraught with dangers of motives such as malice toward the accused, fear, threats, and promises or hopes of leniency or benefits from the prosecution." *People v. McLaurin*, 184 Ill. 2d 58, 79 (1998). "Because accomplice testimony is attended with serious infirmities, it should be accepted only with utmost caution and suspicion and have the absolute conviction of its truth." *Id.* Such testimony "must be cautiously scrutinized on appeal." *People v. Holmes*, 141 Ill. 2d 204, 242 (1990). This is not to say, however, that the State's burden of proof is higher when it relies on accomplice testimony. Rather, "while subject to careful scrutiny, the testimony of an accomplice, whether it is corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt." *McLaurin*, 184 Ill. 2d at 79. A reviewing court will not overturn a conviction merely because defendant claims that a

25

witness's testimony was not credible. *People v. Carrilalez*, 2012 IL App (1st) 102687, ¶ 32. "[W]hether accomplice testimony *** is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury." *People v. Wilson*, 66 Ill. 2d 346, 349 (1977).

¶ 61 Viewing the evidence in the light most favorable to the prosecution, we find that the State proved the defendant guilty of home invasion with a firearm beyond a reasonable doubt. The jury heard Mosley's testimony that he, the defendant, and Vinson committed the home invasion. Mosley testified that the defendant and Vinson picked Mosley up from his mother's house, which was near the Clites' trailer, around 11 p.m. on December 10, 2014. Mosley said no one else got into the defendant's vehicle from the time the brothers picked him up until they were stopped by police a few hours later. Mosley claimed that Vinson developed the idea to rob Larry for "weed" while they were smoking in the defendant's car. Mosley wore a red shirt to cover his face, black jogging pants, and a black and gray hooded sweatshirt. The other men wore black hooded sweatshirts, hats, masks, and gloves.

¶ 62 According to Mosley, the three men entered the Clites' trailer through an open door, with Vinson entering first.[7] Vinson had a gun, grabbed Beth by her neck, choked her son, and pointed the gun at Beth and her son. When Larry recognized Mosley's voice, Vinson kicked Larry in the face. The men ran from the trailer, got into the defendant's vehicle,

[7]Beth testified that neither she nor anyone else gave the men permission to enter her home. Thus, the evidence established that the men entered the Clites' trailer "without authority." See *Witherspoon*, 2019 IL 123092, ¶ 25; 720 ILCS 5/19-6(a)(3) (West 2014).

and drove back to Herron's residence. They stayed there until Vinson turned on a scanner and heard police talking about the crime. They then left the trailer in the defendant's vehicle with the defendant driving, Vinson in the front passenger seat, and Mosley in the backseat. Shortly thereafter, the police activated their lights to stop the vehicle.

¶ 63    Mosley's testimony was corroborated in the following respects. Several officers who interviewed the defendant testified that he changed his story several times during the course of their respective interviews. See *People v. Trajano*, 2018 IL App (2d) 160322, ¶ 28 (finding a rational jury could have found defendant's changing story to be evidence of consciousness of guilty, which supported a finding that she was proved guilty beyond a reasonable doubt). Nevertheless, the defendant eventually admitted that on the night of the home invasion, he, Mosley, and Vinson drove around the trailer parks on South Illinois Avenue and that they stopped at the Malibu apartment complex, which was near the Clites' trailer park. Further, the defendant admitted that from when he picked up Vinson and Mosley, until they were stopped by police, the three men were together, no one else was in the car with them, and it was just those three in the vehicle all night. After the defendant and Vinson voluntarily consented to a search of their cell phones, Detective Weisenberger determined, based on their text messages, that they met up around 11:50 p.m. on December 10, 2014, or about one hour before the Clites' 9-1-1 call.[8]

_____

[8]Although the defendant challenges a portion of Weisenberger's testimony as insufficient to support the defendant's conviction, that testimony related to the HCSA providing locations of Vinson's cell phone after the home invasion took place. However, the defendant does not object to Weisenberger's testimony that based on his review of Vinson's and the defendant's text messages, the men met up around 11:50 p.m. on December 10, 2014. Moreover, we find that there was sufficient evidence to support the defendant's conviction without the HCSA evidence, and thus, we need not discuss the defendant's argument relating to that evidence any further.

¶ 64    Additionally, Mosley's testimony was corroborated in part by the victims' testimony, the physical evidence recovered from his vehicle, and the victims' identification of that evidence.  The victims testified that three or four masked intruders entered the Clites' trailer without permission at approximately 12:30 a.m. on December 11, 2014.  There was a man wearing a red cloth around his face and a black hooded sweatshirt.  The men demanded marijuana, grabbed Beth by her neck, and threatened Beth and her son with a gun.  The victims testified that the intruders took marijuana, Beth's and the Clites' friend Francine Simpson's cell phones, and a pack of Newport cigarettes.  After Larry recognized the voice of one of the men, they grabbed him and punched him in the face.  Beth testified that the man who grabbed her was holding a gun but was not the man wearing red over his face.

¶ 65    Also, as we thoroughly discussed above, Beth's cell phone was tracked via GPS after it was stolen during the home invasion.  The GPS tracking led to police officers eventually stopping the defendant's vehicle, and the stolen phones were found therein.  When Weisenberger asked the defendant how the stolen phones got in his car, the defendant's explanation was that it was attributed to "[s]ome paranormal activity shit."  See *People v. Nyberg*, 275 Ill. App. 3d 570, 579 (1995) (when a defendant attempts to explain the facts surrounding a crime, he is obligated to tell a reasonable version of events or be judged by his story's inconsistencies and improbabilities).  The officers also recovered a red shirt with the sleeves tied together in a knot, a plastic bag of marijuana, a pack of cigarettes, a gray long-sleeved shirt, and a black hooded sweatshirt from the defendant's vehicle.  Larry identified the bag of marijuana and pack of cigarettes as similar to those

28

stolen from him. Further, Beth testified that the black hooded sweatshirt looked like one worn by one of the intruders and that the red shirt looked similar to the red cloth she saw covering the face of another one of the intruders.

¶ 66 In support of his argument, the defendant cites to *People v. Wilson*, but that case is readily distinguishable because there was no corroboration of the accomplice's identification testimony. 66 Ill. 2d at 350. In *Wilson*, defendant was on trial for armed robbery. *Id*. at 348. The accomplice, who testified against defendant in exchange for immunity in the case, stated that he initiated the plan to rob the victim. *Id*. According to the accomplice, defendant went to the victim's apartment, robbed her, and then ran to the accomplice's car where it was parked a distance away. *Id*. The victim testified that when she responded to a knock at her door, she saw a man with a jacket pulled up to just below eye level; he threatened her with a gun, took her purse, and ran. *Id*. When the victim was shown a lineup that included defendant and the accomplice, she identified neither, and in fact identified a third man. *Id*. She also failed to identify defendant at trial. *Id*. The supreme court, noting that the accomplice's identification testimony was uncorroborated, held that the State failed to prove defendant guilty beyond a reasonable doubt. *Id*. at 350.

¶ 67 In *Wilson*, there was corroboration of the accomplice's testimony that a crime occurred, but no corroboration that defendant committed it. *Id*. Here, by contrast, the evidence presented as to the defendant's whereabouts before and after the home invasion, the victims' testimony that there were three intruders, and the physical evidence found in the defendant's vehicle sufficiently corroborated Mosley's testimony that the defendant was one of the intruders. In sum, while Mosley's testimony had deficiencies, the jury was

29

in a superior position to judge his demeanor, weigh his credibility, and resolve any conflicts in his testimony. See *Collins*, 106 Ill. 2d at 261-62; see also *Wilson*, 66 Ill. 2d at 349. We decline to disturb the jury's assessment of his credibility, particularly given that several aspects of his testimony were corroborated by the other evidence presented at trial. In light of the foregoing, we find that the State proved beyond a reasonable doubt that the defendant was one of the intruders who committed the home invasion at the Clites' trailer.

¶ 68                      D. Ineffective Assistance of Counsel

¶ 69    The defendant further maintains that he was denied effective assistance of counsel. The defendant asserts that trial counsel was ineffective in failing to: (1) object to a portion of Detective Weisenberger's testimony, (2) review discovery material prior to trial, (3) object to a portion of the State's examination of Mosley and to the State's references to Mosley's credibility during its closing argument, and (4) object to a jury instruction. The defendant alleges that he was prejudiced by his trial counsel's individual errors and that the cumulative effect of the errors denied him a fair trial. Additionally, the defendant contends his posttrial counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness in a posttrial motion.

¶ 70    Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result

30

would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 71 To establish deficiency under the first prong of the *Strickland* test, "defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The reviewing court must evaluate counsel's performance from her perspective at the time rather than "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). An evaluation of counsel's actions cannot extend into matters involving the exercise of judgment, strategy, or trial tactics. *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000). "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335.

¶ 72 To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Richardson*, 189 Ill. 2d at 411. If defendant's claim can be disposed of on the basis that he suffered no prejudice, then a court should not decide whether counsel's performance was deficient. *People v. Villanueva*, 382 Ill. App. 3d 301, 308 (2008).

¶ 73 The defendant initially claims trial counsel was ineffective for failing to object to Weisenberger's testimony, based on Vinson's cell phone records, as to the approximate locations of Vinson's phone on the night of the home invasion, both before and after the

31

Clites' 9-1-1 call. The defendant contends that this testimony was inadmissible hearsay and that it lacked foundation. We disagree. Assuming *arguendo* that counsel's performance was deficient, we agree with the State that the defendant was not prejudiced as a result of the alleged error. The record reveals that Vinson's movements, as testified to by Weisenberger, were corroborated through other evidence, and as such, there was sufficient evidence to support the conviction, even without Weisenberger's testimony. First, Mosley's testimony specifically placed the defendant in the Clites' trailer in the Cedar Lane Mobile Home Park during the home invasion. Mosley's testimony was consistent with the victims' testimony on this point, as they testified that they saw three or four masked men during the home invasion. Second, Mosley testified that he met up with the defendant and Vinson around 11 p.m. on December 10, 2014, that the three men returned to Herron's trailer on Gold Drive immediately after the home invasion, and that no one else got into the vehicle from the time the brothers picked Mosley up until the time they were stopped by the police a few hours later. Additionally, the testimony of the officers who interviewed the defendant revealed that the defendant admitted he was with Vinson and Mosley in his vehicle on the night of the home invasion, that the three men went to Herron's trailer on Gold Drive, and that no one else had been in the defendant's vehicle from the time the three men met up earlier that night until the time they were stopped by the police.

¶ 74 Moreover, several officers testified as to their personal observations and tracking of the defendant's vehicle from the time it left Gold Drive until it was stopped. When Officer Harsy radioed the location of Beth's stolen phone as 76 Gold Drive, Sergeant Jarin

Dunnigan drove to that address and personally observed the defendant's vehicle coming from the direction of that location and traveling westbound on Pleasant Hill Road. Dunnigan and Officer Lomax both testified as to their personal observations that the defendant's vehicle took a path of travel that was consistent with the movements of Beth's stolen phone per Harsy's radio transmissions. The foregoing reveals that Weisenberger's testimony was cumulative of, and corroborated by, other properly admitted testimony identifying the defendant and his part in the home invasion. The defendant cannot demonstrate prejudice when other independent evidence sufficiently supported the jury's verdict.

¶ 75    In support of his claim, the defendant relies on *People v. Ramos*, 2018 IL App (1st) 151888. In that case, the First District determined that a detective's testimony about defendant's HCSA was inadmissible hearsay, and because the error in admitting the hearsay testimony was not harmless, reversed and remanded the matter for a new trial. *Id.* ¶¶ 18-25. We find *Ramos* distinguishable, however, for two important reasons. Importantly, the *Ramos* court was not reviewing a claim of ineffective assistance of counsel under *Strickland*, and thus, the standard of prejudice was different than the standard applicable in this case. Compare *Ramos*, 2018 IL App (1st) 151888, ¶¶ 24-25 (applying a harmless error standard), with *Richardson*, 189 Ill. 2d at 411 (explaining that *Strickland* prejudice is more than an "outcome-determinative" test). Additionally, central to the *Ramos* court's decision was the fact that there was no other evidence putting defendant inside the vehicle that followed the victim. 2018 IL App (1st) 151888, ¶ 25. As such, the hearsay testimony prejudiced defendant because it allowed the jury to make an "inferential

leap" in order to conclude that defendant was at the crime scene. *Id*. In contrast, no inferential leap was required in the present case because Mosley's testimony explicitly placed the defendant at the crime scene.

¶ 76 Based on the foregoing analysis, we find there is no reasonable probability that a different result would have occurred without the admission of Weisenberger's testimony as to the approximate locations of Vinson's phone on the night of the home invasion. As the defendant has failed to prove he was prejudiced as a result of such alleged errors, his claims of ineffective assistance of counsel must fail.

¶ 77 The defendant additionally contends that trial counsel was ineffective for failing to review the discovery material about Vinson's cell phone records prior to trial. The defendant alleges that he was prejudiced by counsel's failure to review such records because counsel failed to cross-examine Weisenberger about time discrepancies between the records and his testimony. Having just found that Weisenberger's testimony relating to Vinson's cell phone records was cumulative of other properly admitted evidence, the defendant cannot establish that he was prejudiced by trial counsel's alleged failure to review the cell phone records and cross-examine Weisenberger or by posttrial counsel's failure to raise the issue in a posttrial motion. As the defendant has failed to prove he was prejudiced as a result of the alleged error, his claims of ineffective assistance of counsel must fail.

¶ 78 The defendant next claims trial counsel was ineffective for failing to object to a portion of the State's examination of Mosley and to subsequent references to his credibility during the State's closing argument. We disagree. The State is prohibited from vouching

for a witness's credibility.  *People v. Garcia*, 231 Ill. App. 3d 460, 473 (1992).  However, it is not improper for the State to elicit testimony that a witness has entered into a plea agreement which requires him or her to provide truthful testimony, so long as the State does not suggest that it possesses information about the witness's veracity that the jury does not have.  See *id*.  As pronounced by the Second District:

> "A prosecutor who causes the promise of a witness to provide truthful testimony pursuant to a plea agreement to be revealed has only revealed that the witness agreed to tell the truth; the prosecutor has not expressed a personal opinion as to whether the witness has actually complied with the agreement by telling the truth.  Therefore, we conclude that bringing forth such an agreement does not constitute improper vouching for the credibility of the witness." *Id*.

¶ 79    Here, the defendant complains of the following portion of the State's direct examination of Mosley, which directly followed Mosley's testimony detailing the terms of his plea agreement with the State:

> "Q. Now, are you also aware that as part of this agreement, there is one person, one person, alone, who makes the determination as to whether you're being truthful?
> A. Yes.
> Q. And who is that person?
> A. You.
> Q. Me; right?
> A. Yes.
> Q. And so you know, do you not, that if you don't tell the truth, or I believe you're not telling the truth, you do not get the benefit of this deal?
> A. Yes."

Our review of the record leads us to conclude that the foregoing did not constitute improper vouching for Mosley or a "usurpation of the jury's role in determining Mosley's credibility."  Instead, the State merely elicited testimony that under the plea agreement, Mosley agreed to tell the truth during his testimony and that the State would determine

35

whether Mosley fulfilled that obligation. Because the State's questions were not improper, an objection to them would have been meritless, and we will not find trial counsel ineffective for failing to assert it. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14 (defense counsel will not be found ineffective for failing to assert a meritless objection).

¶ 80    As to closing argument, the State is generally allowed to comment on a witness's credibility so long as the remarks are based on the evidence presented or reasonable inferences therefrom. *People v. Pope*, 284 Ill. App. 3d 695, 706 (1996). The State is also entitled to assume the truth of its evidence against a defendant. *People v. Rivera*, 262 Ill. App. 3d 16, 27 (1994). However, a prosecutor is not allowed to personally vouch for or express his personal opinion as to the credibility of a witness (*Pope*, 284 Ill. App. 3d at 707), or to put the integrity of the state's attorney's office behind a witness's testimony (*Rivera*, 262 Ill. App. 3d at 27). A prosecutor violates this rule if he explicitly states that he is asserting his personal views as to a witness's credibility. *Pope*, 284 Ill. App. 3d at 707. On the other hand, a prosecutor does not improperly assert his personal views about a witness's credibility if the jury must infer that the prosecutor is doing so based on his comments. *Id*.

¶ 81    In this case, the defendant complains of the following remarks made during the State's closing argument. The State argued, "And the one thing and the very first thing I want you to remember is that Elijah Mosley admitted and acknowledged his role in this and that, if nothing else, is worthy of belief." The State continued, arguing that there were "points upon which Elijah Mosley's statement can not [*sic*], in any way, be doubted because they have been corroborated by the statements of these two individuals or the

cellphone records from these two individuals' cellphones." The State told the jury, "[W]e know from the Verizon tracking of Mr. Vinson's cellphone in that car that Mr. Vinson's cellphone, from the time right before the robbery, until the time it was found at Gold Drive, was in the vicinity of Cedar Lane Mobile Home Park and South Illinois Avenue just like Elijah Mosley said." We find these statements fell within the bounds of permissible comments directed at Mosley's credibility and the evidence in the case. Unlike the cases relied on by the defendant, *People v. Roach*, 213 Ill. App. 3d 119, 123-24 (1991), and *People v. Valdery*, 65 Ill. App. 3d 375, 378 (1978), the State in this case did not explicitly announce that it was asserting its personal views as to Mosley's credibility, and thus, its argument was not improper. Because an objection to the State's closing argument would have been meritless, trial counsel will not be found ineffective for failing to assert it. See *Bradford*, 2019 IL App (4th) 170148, ¶ 14. Similarly, as there was no error, posttrial counsel cannot be found ineffective for failing to raise the issue in a posttrial motion.

¶ 82     The defendant also maintains that trial counsel was ineffective for failing to object to the jury instructions as to the charged offenses. Specifically, the defendant argues that he was charged with armed robbery and home invasion with a firearm, but the jury was instructed that it should find the defendant guilty if it found that he was armed with a dangerous weapon. As we have previously stated, the defendant's conviction for armed robbery was vacated by the trial court, and thus, we need not discuss whether trial counsel was ineffective for failing to object to the armed robbery instruction.

¶ 83     With respect to the home invasion instruction, we find that, even assuming that counsel's failure to object to the jury instruction was unreasonable, the defendant was not

37

prejudiced by this error. To establish prejudice, the defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Richardson*, 189 Ill. 2d at 411. Although the instruction defining the offense of home invasion given to the jury discussed being armed with a dangerous weapon, the jury was subsequently instructed to determine whether the defendant, or someone for whose conduct he was legally responsible, committed the offense while armed with a firearm. A reviewing court is required to assess whether the jury instructions, considered as a whole, fairly describe the law applicable to the case. *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 83. Considering the entire set of instructions given to the jury in this case, we find that the jury was fully and fairly apprised of the fact that it was required to determine whether the defendant was armed with a firearm during the commission of the home invasion. Moreover, there was sufficient evidence to support the jury's finding, as Beth testified that all three of the intruders were armed with firearms. See *People v. Clark*, 2015 IL App (3d) 140036, ¶ 20 (a witness's unequivocal testimony that defendant had a gun is sufficient circumstantial evidence to prove that he was armed with a firearm). Based on the foregoing analysis, we find there is no reasonable probability that a different result would have occurred had trial counsel objected to the home invasion instruction. Similarly, there is no reasonable probability that a different result would have occurred had posttrial counsel raised the issue in a posttrial motion. As the defendant has failed to prove he was prejudiced as a result of the alleged error, his claim of ineffective assistance of counsel must fail.

¶ 84    Finally, the defendant argues that, even if none of defense counsels' errors justify reversal of his conviction and a new trial, the cumulative effect of such errors does. According to the preceding analysis, we have found that trial counsel was not ineffective in declining to argue the defendant's speedy trial motion and in failing to object to the State's examination of Mosley and to subsequent references to his credibility during closing arguments. As there were no errors with respect to those issues, we will not find posttrial counsel ineffective for declining to raise them in a posttrial motion. We further found that even if we were to assume that trial counsel or posttrial counsel erred with respect to Weisenberger's testimony, the discovery materials, or the jury instructions, the defendant has failed to show he was prejudiced as a result. In light of our conclusions, the defendant was not prejudiced by any cumulative effect of such alleged errors, and his argument must fail. See *Garcia*, 231 Ill. App. 3d at 478 (similarly finding).

¶ 85                            E. Clerk-Imposed Fines

¶ 86    Lastly, the defendant argues that the circuit clerk improperly imposed a number of fines against him. He is correct in asserting that this was erroneous, since only a judge can impose fines. See *People v. Smith*, 2014 IL App (4th) 121118, ¶ 18. In response, the State argues that we lack jurisdiction over this issue and that we should remand pursuant to Illinois Supreme Court Rule 472 (eff. May 1, 2019). The defendant has accepted the State's position and agrees that the matter should be remanded so that he may raise this issue before the trial court.

¶ 87    During the pendency of this appeal, the Illinois Supreme Court issued its opinion in *People v. Vara*, 2018 IL 121823, holding that on review of a judgment of a criminal

conviction, the reviewing court did not have jurisdiction to review a circuit clerk's assessment of improper fines. In *Vara*, defendant was convicted of child pornography, and the circuit clerk indicated in its "electronic accounts receivable record" that defendant was obligated to pay certain fines that were not specified in the trial court's judgment. *Id*. ¶ 1. As in this case, in *Vara*, on direct appeal from his conviction and sentence, defendant "challenged the data entries recorded by the circuit clerk that purported to assess additional fines not imposed by the circuit court." *Id*. The appellate court vacated the fines. *Id*. However, the supreme court held that the appellate court lacked jurisdiction to review the fines and fees assessed by the circuit clerk. *Id.* ¶ 23.

¶ 88 The Illinois Supreme Court held that the circuit clerk's "payment status information sheet" was a clerical document created outside the record of the trial court proceedings and was not part of the common law record or report of proceedings of defendant's criminal prosecution. *Id.* ¶ 22. Further, although the clerk was obligated to record the ruling of the court and had no authority to levy fines against defendant that were not issued by the court's judgment, the clerk improperly doing so was in the nature of a clerical function that was not part of the court's judgment. *Id.* ¶ 23. The supreme court concluded that "the improper recording of a fine is not subject to direct review by the appellate court." *Id*.

¶ 89 Following its decision in *Vara*, the supreme court enacted Illinois Supreme Court Rule 472 (eff. May 17, 2019), which provides in part:

> "(a) In criminal cases, the circuit court retains jurisdiction to correct the following sentencing errors at any time following judgment and after notice to the parties, including during the pendency of an appeal, on the court's own motion, or on motion of any party:

(1) Errors in the imposition or calculation of fines, fees, assessments, or costs;

(2) Errors in the application of *per diem* credit against fines;

(3) Errors in the calculation of presentence custody credit; and

(4) Clerical errors in the written sentencing order or other part of the record resulting in a discrepancy between the record and the actual judgment of the court.

\* \* \*

(e) In all criminal cases pending on appeal as of March 1, 2019, \*\*\* in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." *Id.*

¶ 90    Here, the defendant's direct appeal from his criminal conviction was pending before this court as of March 1, 2019. The defendant has raised the issue of clerk-imposed fines for the first time on appeal. Accordingly, we do not have jurisdiction in this appeal to review the circuit clerk's clerical data entries with respect to the assessment of fines and fees. See *Vara*, 2018 IL 121823, ¶¶ 22-23; Ill. S. Ct. R. 472(a), (e) (eff. May 17, 2019). Therefore, we must remand the matter to the trial court so that the defendant may file a motion pursuant to Rule 472.

¶ 91                                    III. CONCLUSION

¶ 92    For the foregoing reasons, we affirm the defendant's conviction for home invasion with a firearm. However, pursuant to Illinois Supreme Court Rule 472(e) (eff. May 17, 2019), we remand this case to the trial court so the defendant can file a motion regarding clerk-imposed fines.

41

¶ 93    Affirmed and remanded.